*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TUNC URAZ,

      Defendant-Appellant.

UNPUBLISHED
January 19, 2023

Nos. 343695; 343696
Ingham Circuit Court
LC Nos. 16-001064-FH;
          16-001065-FC

Before: CAMERON, P.J., and SHAPIRO and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of aggravated stalking, MCL 750.411i(2), and three counts of solicitation to commit murder, MCL 750.157b(2). The trial court sentenced defendant to 36 to 90 months' imprisonment for the stalking conviction and to three terms of 200 to 360 months' imprisonment for the solicitation to commit murder convictions. The court also imposed various fees and costs. We affirm defendant's convictions and sentences, but vacate the $60 fee for deoxyribonucleic acid (DNA) testing and also vacate a $100 fine.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant and the victim, EM, were in a romantic relationship for approximately 2½ years. Defendant was displeased when EM terminated their relationship. He began harassing her and eventually pleaded guilty—in a separate case from those involved in this appeal—to aggravated stalking. Defendant's prior harassing behavior consisted of many acts, such as invading EM's home, confronting her unexpectedly at an out-of-town restaurant, and damaging her car. The prosecution presented evidence that, while housed in the Ingham County Jail, defendant solicited two fellow inmates and an undercover police officer to murder EM. Accordingly, defendant was charged with three counts of solicitation to murder. He was also charged with aggravated stalking for certain telephone and computer activities that took place in late August of 2016, after the earlier acts encompassed by the prior stalking conviction. Defendant was convicted as charged.

After the trial was completed but before sentencing, defendant's trial counsel suffered from a mental health episode and was hospitalized. He received a diagnosis and treatment. The trial court appointed new counsel to represent defendant at sentencing. In the brief on appeal, defendant

-1-

alleged that he received ineffective assistance of counsel at trial because trial counsel's mental breakdown began during trial as evidenced by the deficient questioning of witnesses. We granted defendant's motion for a *Ginther* hearing[1] and remanded the matter to the trial court.

On remand,[2] the court heard testimony from the prosecutors, defendant's trial counsel and junior members of his team, and defendant. The trial court concluded that defendant failed to show that trial counsel acted unreasonably by failing to introduce evidence of theft-related convictions of the two inmates that defendant approached to kill EM. It noted that trial counsel sought to undermine the testimony of the inmates by noting their incarceration and motive to obtain a benefit from the disclosure, the failure to introduce MRE 609 evidence may have been a matter of trial strategy to prevent a distraction from the motive theory, and the evidence may be considered cumulative. The trial court also rejected the contention that trial counsel engaged in a lengthy delay when questioning the witnesses and that his closing argument rambled on for hours, noting that defendant failed to cite to the record and merely announced his position without offering authority in support. Furthermore, at the *Ginther* hearing, trial counsel explained that any delay between questions was caused by his consultation with defendant. Ultimately, the trial court concluded that there was no evidence that trial counsel suffered from a mental breakdown during the trial. Defendant opined that the breakdown occurred much earlier because of his experience with the mental conditions of family members, but the trial court noted that defendant did not offer expert, only self-serving, opinion. And the attorneys familiar with trial counsel testified that his actions and behavior at the trial were consistent with his normal demeanor. Defendant relied on an e-mail communication that trial counsel sent to defendant's family members. The trial court found that the e-mail did not demonstrate a mental breakdown but was merely overly optimistic and contained exaggerations. Finally, the trial court determined that even if it assumed that trial counsel acted unreasonably, defendant failed to demonstrate prejudice, particularly in light of the overwhelming evidence of his guilt. Thus, the trial court denied relief premised on ineffective assistance of counsel.

## II. JOINDER AND OTHER-ACTS EVIDENCE

Defendant was charged in two separate cases for stalking and for solicitation to commit murder. He contends that the trial court deprived him of a fair trial by allowing the two cases to be joined for trial and further submits that evidence of prior stalking activities unfairly prejudiced the solicitation charges such that they should have been excluded from trial. We disagree.

When evaluating a joinder decision, the appellate court reviews the trial court's factual findings for clear error and reviews de novo its conclusion regarding whether the charged offenses were "related" offenses for which joinder was appropriate. *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). Additionally, a trial court's decision regarding the admission of evidence

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). See *People v Uraz*, unpublished order of the Court of Appeals, entered March 6, 2020 (Docket Nos. 343695; 343696). The scope of the remand order was limited to the issue raised in the motion.

[2] Defendant requested to attend the hearings in-person. Consequently, there was a delay in conducting the hearings because of COVID restrictions.

-2-

is reviewed for an abuse of discretion. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017); *People v Muhammad*, 326 Mich App 40, 47; 931 NW2d 20 (2018).

MCR 6.120 states, in part:

**(B) Postcharging Permissive Joinder or Severance.** On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, or sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

\* \* \*

**(C) Right of Severance; Unrelated Offenses.** On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1).

When a logical relationship exists between joined counts as well as overlapping proofs, joinder is appropriate. *Williams*, 483 Mich at 237. The admission of evidence in other trials is also a consideration when examining whether joinder is appropriate because the joinder of other crimes cannot prejudice defendant. *Id*. A temporal requirement is not delineated in MCR 6.120, and the acts need not be committed at the same time, but nonetheless must be connected acts or acts constituting a single scheme or plan. *Id*. at 241. An error in the decision to join cases is not grounds for disturbing the judgment unless refusal to take such action appears to be inconsistent with substantial justice. *Id*. at 243. Moreover, an error in the joinder of cases does not affect the outcome of the proceedings when evidence of each charged offense could have been introduced under MRE 404(b). See e.g., *People v Sabin (After Remand)*, 463 Mich 43, 56-58; 614 NW2d 888 (2000).

The stalking charge was based on conduct that occurred between August 23, 2016, and September 26, 2016. It was during this timeframe that defendant telephoned EM and engaged in certain computer-related activities such as hacking into EM's online accounts. These incidents

were part of defendant's continued harassment of EM, which culminated in his solicitation of her murder. The various acts undertaken by defendant and charged by the prosecutor in the two lower court cases at issue here were indeed a "series of connected acts[.]" MCR 6.120(B)(1)(b).

One stalking charge and three solicitation charges were submitted to the jury, and these offenses were related. MCR 6.120(B)(1). The evidence pertaining to each charge was not particularly complex, and defendant has not established that considerations under MCR 6.120(B)(2) warranted severance. Defendant's contention that the charges resulted in jury confusion is not supported by the record evidence. When there is a lack of evidence of jury confusion and the offenses are related as defined in the court rule, a challenge to the joinder of claims is without merit. See *People v Collins*, 298 Mich App 458, 469-470; 828 NW2d 392 (2012).

Defendant essentially intertwines his severance argument with his argument addressing other-acts evidence, asserting that the other-acts evidence admitted in support of the stalking charge unfairly prejudiced the solicitation case. Defendant does not submit that the prior incidents were irrelevant and inadmissible as propensity evidence under MRE 404. And indeed, the other incidents were relevant and were admissible for non-propensity reasons, such as to show intent and motive with regard to all four counts that defendant faced. See MRE 404(b)(1). That defendant had harassed EM in the past made it more likely that he willfully hacked into her online accounts and contacted her for purposes of harassment, see MCL 750.411i(1)(d) and (e). EM documented defendant's property damage and unwanted contact, obtained a personal protection order (PPO) against him, and reported his violations of the PPO to the police. EM's report of defendant's harassment and its consequences made it more likely that he had a motive to have her killed.

Defendant submits that the extensive admission of acts of stalking diverted the jury from a rational consideration of the evidence addressing the weaker charges of solicitation to commit murder and did not satisfy the balancing test of MRE 403. Thus, defendant contends that his constitutional right to a fair trial was violated. We disagree.

The " '[i]mproper joinder of offenses does not, in itself, violate the Constitution. Rather misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial. ' " *Williams*, 483 Mich at 245, quoting *US v Lane*, 474 US 438, 446 n 8; 106 S Ct 725; 88 L Ed 2d 814 (1986). Relying upon intermediate federal court caselaw,[3] defendant explains that prejudice is demonstrated when "the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval v Calderon*, 241 F3d 765, 772 (CA 9, 2000). The *Sandoval* Court concluded that prejudice arises when the joinder allowed otherwise inadmissible evidence of other crimes to be introduced in a trial, or when a strong evidentiary case is joined with a weaker one. *Id*. As analyzed below, however, the prior acts of stalking were admissible to set forth the foundation and motivation to solicit individuals to kill EM because defendant blamed her for the adverse events

---

[3] "The decisions of intermediate federal courts are not binding on this Court, although they may be considered for their persuasive value." *People v Lucynski*, ___ Mich ___, ___; ___NW2d ___ (2022) (Docket No. 162833), slip op at 14 n 10.

-4-

in his life. And, contrary to defendant's assertion, the aggravated stalking charge did not serve to buttress the substantially weaker charges of solicitation to commit murder.

MRE 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Our Supreme Court has explained that evidence is "probative" if it makes the existence of a consequential fact more probable than it would be without the evidence. *People v Feezel*, 486 Mich 184, 197; 783 NW2d 67 (2010); see also MRE 401. MRE 403 does not prohibit prejudicial evidence but only prohibits evidence that is *unfairly* prejudicial. *Id*. at 198. This unfairness arises if there is a danger that marginally probative evidence will be given undue weight by the jury. *Id*.

In the present case, defendant's prior instances of stalking were highly, not marginally, probative. That is, they showed both that defendant had engaged in aggravated stalking while performing certain acts between August 23, 2016, and September 26, 2016, see MCL 750.411i, and showed that defendant was escalating a series of actions to the point that he was motivated to solicit EM's murder, see MCL 750.157b.

The presentation of the full background of defendant's stalking history allowed the jury to determine whether defendant was merely a scorned partner having emotional difficulty with the end of the relationship or whether defendant actually wanted to kill EM. The history of defendant's acts against her and her new boyfriend placed the charged acts into context. It was not an abuse of discretion for the trial court to give the jury a full picture of the dealings between defendant and EM and to conclude that the probative value of this full picture was not substantially outweighed by the danger of unfair prejudice. MRE 403.

In his supplemental brief, defendant contends that it was not proven that defendant was the person who damaged EM's vehicle and the vehicle of her new boyfriend and that, therefore, evidence of the prior acts of vehicle damage should have been excluded. But this was an entirely reasonable inference from the sequence of events, viewed as a whole. There was substantial evidence that defendant actually perpetrated the acts in question. *People v Goddard*, 429 Mich 505, 515-516; 418 NW2d 881 (1988). Additionally, defendant contends that certain text or online messages as listed in the prosecutor's motion to admit other-acts evidence were not proven to have come from defendant. But the description of item 10 adequately shows in context that the messages emanated from defendant. And as for item 5, EM explicitly testified that the text in question came from defendant. With regard to item 2, defendant inaccurately represents that the court admitted a message mentioned in that item. The court admitted a statement about the out-of-town restaurant incident but did not, contrary to defendant's implication on appeal, admit a Facebook message sent on the afternoon of December 31, 2015. Thus, the trial court properly reviewed the other-acts evidence for factual support, and its rulings were not inconsistent or irrational.

Defendant makes a separate argument in his supplemental brief about an incident during which defendant attempted to obtain a gun from a coworker at Michigan State University (MSU). He asserts that the court admitted evidence of this incident based on defendant's testimony during a pretrial entrapment hearing and that this amounted to a violation of the qualified privilege a defendant is allowed when testifying at an entrapment hearing. See *People v D'Angelo*, 401 Mich 167, 178; 257 NW2d 655 (1977) ("Any testimony the defendant gives at the entrapment hearing, including his possible admission of the crime charged or some aspect of it, will not be admissible against him in the case in chief for substantive purposes as an admission[.]"). The *D'Angelo* holding, however, was not violated because defendant's testimony from the entrapment hearing was not, in fact, admitted against him at trial. The MSU incident was brought out through the coworker's testimony. Also, it is simply not apparent from the record that the trial court relied on defendant's testimony at the entrapment hearing when admitting the evidence about the MSU incident, the facts of which were admitted through other witnesses.

Because a logical relationship existed between the stalking and the solicitation to commit murder offenses as well as overlapping proofs, joinder was appropriate. *Williams*, 483 Mich at 237. Defendant failed to establish error with regard to the joinder of the cases or with regard to the admission of the other-acts evidence. Furthermore, defendant did not demonstrate that the joinder of offenses rendered his trial substantially unfair such that he suffered prejudice. To the contrary, the trial court instructed the jury regarding the limitations of the other-acts evidence as well as the need to consider each of the charges separately. Therefore, defendant was not deprived of a fair trial. *Sandoval*, 241 F 3d at 772.

## III. ALLEGED *BRADY* VIOLATION

Defendant contends that certain notes written by jail inmate Reginald Close were favorable to the defense and were not disclosed in discovery in violation of *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). We disagree.

We review de novo an allegation of a *Brady* violation. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). The components of a *Brady* violation are that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material. *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching," and whether the prosecutor acted in good faith is irrelevant. *Id*. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

Defendant has not established a *Brady* violation. First, the notes were, in fact, given to the defense,[4] and defense counsel cross-examined Close about the notes, insinuating that Close had a

---

[4] On November 2, 2017, before voir dire continued, the parties discussed the disclosure of notes that were written on toilet paper, the difficulty reading the notes, and the problem deciphering the author of some content. On the record, the prosecutor stated that he had turned over the notes to

habit of trying to learn about the cases of other inmates in order to help himself. Second, testimony showed that the potentially most relevant portion of the notes—i.e., the portion wherein someone referred to being a good liar and being able to fool a polygraph examiner—was written by Close's correspondent and not by Close. Defense counsel himself admitted, "Based upon my review of [the notes] it doesn't appear that the statement that was made by the individual in the notes, associated with being able to pass a polygraph test, is Reginald Close." The notes were, quite simply, not particularly helpful to the defense. Defendant contends that the notes would likely have led to the dismissal of the solicitation to commit murder charges "as based upon testimony from a witness who was an admitted liar," but there is no indication from the record that Close admitted to being a liar in the notes. This claim of error does not entitle defendant to appellate relief.

## IV. ENTRAPMENT

Defendant contends that the trial court erred in failing to conclude that defendant was entrapped by the undercover officer, FM, who posed as a hitman and had a video call with defendant at the county jail. We disagree.

"A trial court's finding of entrapment is reviewed for clear error." *People v Johnson*, 466 Mich 491, 497; 647 NW2d 480 (2002). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. at 497-498. Entrapment occurs if "(1) the police engaged in impermissible conduct that would induce a law-abiding person to commit a crime in similar circumstances or (2) the police engaged in conduct so reprehensible that it cannot be tolerated." *Id*. at 498. "A defendant has the burden of establishing by a preponderance of the evidence that he was entrapped." *Id*.

First, there is no evidence of particularly reprehensible conduct by the police in connection with FM's video call. A police detective testified that Close, who was *not* associated with the police, provided information about solicitation to commit murder, the police investigated the details Close provided, and only then was FM used as an undercover officer. The police were simply attempting to ascertain whether defendant was, indeed, willing to have EM killed. In other words, "[T]he police did nothing more than provide defendant with an opportunity to commit a crime. Such conduct was not reprehensible and does not establish entrapment." *Id*. at 508.

---

defense counsel "late last week." There was also a discussion of a "tissue" paper note that pertained to an unrelated matter. Nonetheless, the trial court concluded that all notes should be given to the defense. During trial, defendant's counsel questioned whether he received all relevant notes in discovery and that he might move to dismiss premised on a *Brady* violation. But no motion was filed in the trial court. Thus, on appeal, defendant's contention, that pertinent discovery addressing defendant's case was not provided until trial, is not supported by the record. Rather, it was a letter pertaining to an unrelated matter that was disclosed during trial. And, during the course of cross-examining the witnesses, defense counsel learned that potential impeachment evidence on the toilet paper notes was not authored by the jail inmates that interacted with defendant regarding EM. Thus, the factual predicate to support the *Brady* violation is lacking.

The *Johnson* Court stated:

> When examining whether governmental activity would impermissibly induce criminal conduct, several factors are considered: (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was charged, (3) whether there were any long time lapses between the investigation and the arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen, (5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted. [*Id*. at 498-499.]

There was no evidence here of any appeals to sympathy or of any favors, inducements, pressure, or threats by the police. In addition, there was no "escalation" of culpability by the police because defendant had already solicited Close to murder EM before FM's call. As in *Johnson*, "[t]he undercover activity at issue in this case did nothing more than present defendant with an opportunity to commit" a crime that the defendant had already committed. *Id*. at 503. The *Johnson* Court indicated that in such a situation, "no escalation occurred." *Id*. Defendant contends that the trial court relied too heavily on defendant's predisposition to commit the crime, but *Johnson* indicates that the fact of a defendant's having committed the same crime earlier is a *relevant consideration* regarding whether the police induced an escalation of criminality. While a few of the factors cited in *Johnson* could be viewed in defendant's favor—such as the targeted investigation—the majority of the factors favor the prosecution, and the trial court did not clearly err by finding that dismissal on the basis of entrapment was not appropriate with regard to the evidence gathered by FM.[5]

Defendant also contends that the trial court did not properly follow an objective test, focused "on the investigative and evidence-gathering procedures used by the governmental agents," but instead used a subjective test, "which focuses on the defendant's predisposition or motivation to commit a new crime." See *People v Juillet*, 439 Mich 34, 53; 475 NW2d 786 (1991) (opinion of BRICKLEY, J.). Furthermore, "[u]nder a proper approach, factors of both the subjective and objective tests can be considered and utilized to determine if entrapment occurred." *Id*. Contrary to defendant's assertion, the trial court's ruling did in fact rely quite heavily on objective

---

[5] Defendant argued below that all three solicitation charges should be dismissed because of entrapment and is continuing to argue as much on appeal. But entrapment is based on police conduct, and the evidence clearly showed that the solicitation information from Close and another jail inmate did not arise from police involvement.

police conduct. This case is in accordance with *Johnson*, and no error requiring reversal is apparent.[6]

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that his trial counsel was ineffective in several respects. We disagree.

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews a trial court's factual findings for clear error and its conclusions of law de novo. *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019). To obtain relief on the basis of ineffective assistance of counsel, a defendant "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). A defendant must overcome a strong presumption that counsel's actions were based on sound trial strategy. *Id*. at 388.

## A. COUNSEL'S ILLNESS

On remand, the court conducted an evidentiary hearing to address trial counsel's mental health to determine whether it deprived defendant of the effective assistance of counsel. Trial counsel testified that he was not sleeping well during and after the trial. He took a trip after defendant's trial was complete, but was required to return home early to address a family matter. After his return, trial counsel was hospitalized and treated for a mental health issue.[7] The prosecutors and second chair defense counsel did not notice or report that trial counsel suffered from a mental health issue during the trial. One of the prosecuting attorneys attended law school with trial counsel and had known him for many years. He did not observe any issues that arose during the trial. Although the jail inmates solicited to commit murder had theft-related convictions, trial counsel did not elicit this information, but focused on their motivation to lie. One

---

[6] Given the clear evidence that no entrapment occurred, defendant's argument about whether a defendant can claim entrapment and also assert innocence in a pretrial proceeding need not be reached.

[7] In his pro se supplemental brief filed after remand, defendant purportedly cites to the mental health records of trial counsel. There is no indication that those records were admitted at the *Ginther* hearing. It is unclear how defendant obtained the records and whether it was in compliance with the laws protecting the privacy of individual health information. We limit our evaluation of the mental health issue to the testimony elicited at the hearing. As a general rule, "[a]ppeals to the Court of Appeals are heard on the original record," MCR 7.210(A), and the parties may not expand the record on appeal, *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013).

of the prosecutors opined that deficient performance by trial counsel did not occur in failing to elicit this impeachment evidence. He cited to the limited attention span of the jury and the lack of import of a "shoplifting" conviction, the knowledge that the jail inmates were incarcerated at the time of the solicitation, and the inmate's motivation to benefit from being cooperative with the authorities.

Although defendant testified that he had exposure to individuals with mental illness and opined that trial counsel suffered from the effects before and during trial, the trial court found that this testimony was self-serving. It noted that defendant never objected to trial counsel's performance and was willing to have trial counsel continue his representation after the disclosure of the mental health issue.

Defendant alleges that trial counsel was ineffective for failing to seek a continuance when he began to suffer from mental health issues during the trial as evidenced by his failure to effectively cross-examine witnesses, especially those convicted of theft-related offenses.[8] The trial court, however, did not find that a mental health issue arose during the trial, and we cannot conclude that this finding was clearly erroneous. *Miller*, 326 Mich App at 726. Further, the trial court did not find that trial counsel's questioning of witnesses was ineffective. Rather, it concluded that, in light of the nearly 30 witnesses that trial counsel interviewed, it was a matter of trial strategy to focus on the motivation of the jail inmates to lie to obtain favorable treatment. And, the record reveals that defendant was provided a different attorney when the illness manifested after trial and before sentencing and that defendant acquiesced to this substitution. Defendant points to an e-mail that trial counsel sent to defendant's sister, contending that it demonstrates that trial counsel was acting erratically. Although this e-mail was overly positive and exaggerated the potential success of the criminal trial and possible civil claims, it simply does not reflect that trial counsel was somehow incapacitated during material portions of his representation of defendant or that his

---

[8] Defendant contends that trial counsel was ineffective for failing to cross-examine Allen and Close with certain prior convictions, producing Internet Criminal History Access Tool (ICHAT) information purportedly reflecting a 2011 misdemeanor larceny conviction property valued over $200, but less than $1,000, MCL 750.356(4)(a), for Allen and a 2003 felony conviction for third-degree home invasion, MCL 750.110a(4), for Close. The attached ICHAT records reflect that they were obtained after defendant's conviction, but before his sentencing and they were not part of the lower court record.

Assuming arguendo that we could take judicial notice of such convictions, MRE 201, decisions whether and how to cross-examine witnesses are matters of trial strategy. *People v Petri*, 279 Mich 407, 413; 760 NW2d 882 (2008); *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Even so, counsel's failure to develop defenses by adequately impeaching witnesses may establish ineffective assistance. *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

As to Allen, this Court has held that a misdemeanor larceny conviction does not contain an element of dishonesty and is not admissible for impeachment under MRE 609(a)(1). See *People v Parcha*, 227 Mich App 236, 245; 575 NW2d 316 (1997). As to Close, the record does not reflect that that third-degree home invasion necessarily contained an element of theft, as required by MRE 609(a)(2), or an element of dishonesty or false statement, as required under MRE 609(a)(1).

-10-

representation of defendant fell below an objective standard of reasonableness. *Ackley*, 497 Mich at 389.

In further support of his claim of ineffective assistance at trial, defendant relies on cross-examination when trial counsel allegedly took a long pause between questions. This contention is premised on a comment by the prosecutor that three minutes was occurring between the questioning. But trial counsel testified that he took time between questions to confer with defendant. Furthermore, the defense counsel acting as second-chair testified that the lapse of time argued by the prosecutor was an exaggeration. The trial court also did not find that trial counsel rambled in his closing argument. Thus, the evidence does not reflect that trial counsel's representation of defendant fell below an objective standard of reasonableness. *Id.* The court remarked that counsel acted in an acceptable manner in defending such a serious case. Defendant has established no basis for a reversal in connection with trial counsel's illness.

## B. DEFENDANT'S MENTAL STATE

In defendant's pro se brief, defendant contends that trial counsel was aware of defendant's poor mental state and should have further investigated, presented evidence of, and consulted an expert after counsel recognized defendant's diminished state of mind at the time of the offense undermined the specific intent necessary to prove the solicitation to commit murder charges. Additionally, defendant asserts that counsel should have requested a continuance to have defendant undergo the necessary psychiatric evaluation. Despite the limited nature of defendant's statement of the question presented, see MCR 7.212(C)(5), defendant also cites MCL 768.20a, which governs the raising of an insanity defense, and argues counsel failed to request that he be sent to the forensic center for evaluation. And defendant further contends that he lacked an appreciation of the wrongfulness of his acts, and, if counsel had presented expert testimony, presumably in support of an insanity defense, there was a reasonable probability of a different outcome at trial.

Defendant did not move for a *Ginther* hearing in connection with this issue, and his earlier motion to remand for such a hearing did not include this issue. Instead, defendant simply argues that his convictions should be reversed and a new trial should be granted.[9] When a *Ginther* hearing has not been requested to address a particular issue, review is limited to the record, and "[i]f the appellate record does not support defendant's assertions, he has waived the issue." *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000).

Defense counsel, however, has a duty to prepare, investigate, and present all substantial defenses. *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009). "[F]ailure to conduct a complete investigation" can constitute ineffective assistance of counsel if the failure creates a "reasonable probability that the result of [the] trial would have been different had the evidence in question been presented." *People v Grant*, 470 Mich 477, 498; 684 NW2d 686 (2004).

---

[9] To support his claims, defendant attaches several documents. Only trial counsel's October 17, 2017 motion to dismiss for entrapment, is in the lower court record, and we cannot consider defendant's additional documents defendant now provides. *Nix*, 301 Mich App at 203.

Defense counsel "is [also] given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). The decision to present an insanity defense can be an issue of trial strategy, and we will not reverse where the failure to raise an insanity defense was a matter of trial strategy. *People v Newton (After Remand)*, 179 Mich App 484, 493; 446 NW2d 487 (1989). Likewise, counsel's decision not to present an insanity defense is a matter of trial strategy where counsel chooses to pursue another defense based on a tactical choice. *People v Lotter*, 103 Mich App 386, 390-391; 302 NW2d 879 (1981). Again, this Court does not substitute its judgment for that of counsel regarding matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *Rockey*, 237 Mich App at 76-77.

A defendant may also opt to present inconsistent defenses. *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997). But trial counsel's decision not to present a defense that is inconsistent with counsel's theory is likewise a matter of trial strategy that this Court does not second-guess. *People v Rice (On Remand)*, 235 Mich App 429, 445; 597 NW2d 843 (1999).

"[M]ental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent." *People v Carpenter*, 464 Mich 223, 237; 627 NW2d 276 (2001). Thus, diminished capacity is not a defense available in our state.[10] *Id*. at 226. And trial counsel was not ineffective for failing to pursue a non-existent defense. *Sabin (On Second Rem)*, 242 Mich App at 660.

To establish an insanity defense, a defendant bears the burden of proving by a preponderance of the evidence that he had a mental illness that caused him to lack the "substantial capacity either to appreciate the nature and quality or the wrongfulness of his . . . conduct or to conform his . . . conduct to the requirements of the law" at the time of the charged offense. MCL 768.21a(1), (3). But when an individual is "under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his . . . alleged offense" he "is not considered to have been legally insane solely because of being under the influence of alcohol or controlled substances." MCL 768.21a(2). Importantly, a defendant, who employs an insanity defense concedes that he committed the charged criminal conduct, and asserts this affirmative defense to avoid criminal responsibility. *People v Mette*, 243 Mich App 318, 328-329; 621 NW2d 713 (2000).

In this case, weeks before trial, defense counsel filed a motion to dismiss for entrapment, alleging that defendant had been in a vulnerable mental state, "off his medications, . . . going through alcohol and sever[e] prescription pain killer[] and benzo withdrawals, . . . [and being] mentally ill." The record also reflects that the trial court had earlier ordered that defendant could have a psychiatrist or psychologist visit at the jail.

From the existing record, it appears that the decision not to pursue an insanity defense was a matter of strategy. And it is not evident that trial counsel made a poor strategic decision by emphasizing the alleged unreliability of the key prosecution witnesses as opposed to pursuing an

---

[10] Our Supreme Court recently scheduled oral argument to address whether *Carpenter* should be overruled. *People v Tyson*, ___ Mich ___; 974 NW2d 838 (2022).

-12-

insanity defense and admitting that defendant had committed the charged crimes. See *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995) (defense counsel's decision regarding the defense to be pursued is a matter of trial strategy.). Recognizing that defendant made some reference below to depression and post-traumatic stress disorder, we conclude that defendant has not overcome the presumption of sound trial strategy, see *Ackley*, 497 Mich at 388, concerning trial counsel's attempt to obtain a not-guilty verdict by challenging the credibility of the prosecution witnesses. Simply put, counsel could have reasonably decided that his chances of persuading the jury that defendant did not comprehend the wrongfulness of his actions—thrice soliciting EM's murder and stalking EM for two years in the face of PPOs—stood less chance of success than persuading the jury that the government's witnesses lacked credibility.

## C. INVESTIGATION AND CALLING OF WITNESSES

Defendant contends that trial counsel should have investigated and called various witnesses for the defense. Defendant provides a list of thirteen witnesses whom he believes should have been called at trial. Defendant does not ask for a remand to explore their potential testimony further, but instead argues that reversal is warranted because of trial counsel's failure to call them. A defendant has the burden of establishing the factual predicate for a claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). In other words, the defendant must prove his claim. *Id*. See also MCR 7.212(C)(7) (stating that facts pertinent to an appellant's argument must be supported by references to the lower court record). Defendant's list of names does not prove his claim of ineffective assistance of counsel. In fact, defendant himself says that "[t]he above named witnesses were all *potentially relevant* to defense theory and facts." (Emphasis added.) The mere *potential* for relevance does not demonstrate that trial counsel acted below an objective standard of reasonableness, see *Ackley*, 497 Mich at 389, by failing to call the potential witnesses. The decision regarding whether to call a witness is presumed to be trial strategy, *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004), and in light of the existing record, defendant has not overcome this presumption or established that the failure to call the witnesses affected the outcome of the proceedings, *Ackley*, 497 Mich at 389.

Indeed, when discussing witnesses below, trial counsel mentioned some of the potential witnesses defendant lists, but did not indicate what testimony they would provide. The exception is Kathy Edmonds; trial counsel stated that Edmonds would be able to testify that defendant had actual trash at his house around the time that defendant and FM had their conversation at the jail, during which they used coded language about "taking out trash."[11] But even if we were to conclude that trial counsel's offer of proof about Edmonds—in the absence of an affidavit from Edmonds herself—is sufficient to *prove* that Edmonds would have testified in this manner, it is not apparent that the failure to call Edmonds fell below an objective standard of reasonableness or affected the outcome of the case. While the beginning of the conversation between FM and defendant might lead to the conclusion that the two were speaking about actual trash, by the end it is abundantly clear that actual trash at defendant's home was not the subject of the conversation. No reasonable

---

[11] The defense insinuation was that when FM agreed to take out trash for defendant, this was not a "coded message" referring to EM's murder but resulted from defendant's desire to have actual trash cleared from his home.

jury, even if it heard from Edmonds that defendant had actual trash at his house, would have concluded that the conversation between defendant and FM was about actual trash.

## D.  OTHER ALLEGATIONS

Defendant states that trial counsel's "cross examinations were meaningless."  Yet, defendant provides no examples of how the cross-examination of witnesses was inadequate.  An appellant may not simply make an assertion and leave it up to this Court to discover the basis for his claims.  *People v Bowling*, 299 Mich App 552, 559-560; 830 NW2d 800 (2013).  At any rate, trial counsel's cross-examination of key witnesses was reasonable.  See *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).  Defendant also argues that "a review of defense counsel's examination of the defense witnesses . . . supports the conclusion that defense counsel was unable to properly represent [defendant]."  Once again, defendant provides no examples of how the cross-examination of these witnesses was inadequate.  *Bowling*, 299 Mich App at 559-560.  One defense witness seemed to have little pertinent information to offer, although trial counsel did elicit from him that defendant was "kind and caring."  As for the second defense witness, trial counsel insinuated through his questioning that inmates Charles Allen and Reginald Close may have been conspiring to set defendant up.

Defendant also contends that trial counsel's closing argument was "rambling and inadequate."  Once again, defendant does not indicate *how* the argument was inadequate and thus his briefing is deficient.  *Id*.  At any rate, trial counsel raised the issue of the credibility of jail informants, discussed the vague language used in the video call between defendant and FM, argued that the police manufactured the solicitation charges to escalate the stalking situation, and submitted that the police investigation into internet-protocol addresses was inadequate.  The closing argument was not deficient.

Defendant also contends that trial counsel acted improperly during jury voir dire.  In support of this argument, defendant cites to the entire voir dire transcript and once again offers no specific examples.  An appellant may not leave it up to this Court to unravel his arguments for him.  *Id*.  Defendant has established no basis for relief on appeal in conjunction with his claims of ineffective assistance of counsel.

## VI.  PROSECUTORIAL ERROR

Defendant argues that the prosecutor made improper comments that prejudiced him.  We disagree.

Defendant did not object below to the comments he deems improper on appeal.  As such, the issue is not preserved.  *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).  This Court reviews unpreserved issues for plain error affecting substantial rights.  *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).  Under the plain-error doctrine, defendant must show a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Id*.  And, even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse.  Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness,

-14-

integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763-764 (citation, quotation marks, and brackets omitted).]

While cross-examining Allen, trial counsel asked him probing questions regarding exactly how he obtained information from defendant about the murder-for-hire scheme and whether Allen had initiated some of the pertinent conversations. Trial counsel also attempted to impeach Allen with his preliminary examination testimony. Counsel's cross-examination questions were appropriate. The prosecutor then said, "Your Honor, I am going to object. This is three minutes between questions. This cross-examination rambles on for hours." The court said, "I can't help that." The prosecutor said that trial counsel had to take a break to gather his thoughts, and the court said, "I can't press that." The court added, "This is a serious matter. So he can utilize whatever strategy he so desires."

A prosecutor may not personally attack defense counsel. *People v McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003). Nor may a prosecutor suggest that counsel is attempting to mislead the jury. *Unger*, 278 Mich App at 236.

There was no clear or obvious error, see *Carines*, 460 Mich at 763, in connection with the prosecutor's comments. As in *McLaughlin*, 258 Mich App at 647, the prosecutor merely had a "momentary expression of impatience" that was fairly "unremarkable[.]"[12] And, "[t]he prosecutor's momentary expression of impatience was too fleeting and unremarkable to constitute an obvious error that denied defendant a fair trial." *Id*. In addition, the court in the present case made clear to the jury that in a serious case such as the one at issue, counsel was entitled to use a strategy, such as taking considerable time between cross-examination questions. Given this assurance from the court, any expression to the contrary by the prosecutor was not outcome-determinative. *Carines*, 460 Mich at 763. Defendant has established no entitlement to appellate relief in connection with the prosecutor's comments.

## VII. VIOLATION OF RIGHT TO COUNSEL

Defendant contends that his Sixth Amendment right to counsel was violated because when FM, the undercover police officer, spoke with him at the jail by video call, defendant was represented by an attorney, who was not present during the video call. We disagree. This issue was not raised below and is thus reviewed under the plain-error standard of *Carines*, 460 Mich at 763-764.

Defendant's primary authority for his argument is *Massiah v United States*, 377 US 201; 84 S Ct 1199; 12 L Ed 2d 246 (1964). In that case, the Court ruled that the defendant had been denied Sixth Amendment protections "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel" that the defendant had already retained. *Id*. at 202, 206. In *Brewer v Williams*, 430 US 387, 401; 97 S Ct 1232; 51 L Ed 2d 424 (1977), the Court stated that the "clear rule of *Massiah* is that once adversary [sic] proceedings have commenced

---

[12] Indeed, at the *Ginther* hearing, the prosecutor opined that trial counsel was engaged in a delay tactic to dilute the import of particularly effective direct examination.

against an individual, he has a right to legal representation when the government interrogates him." The Court referred to the commencement of adversarial proceedings as a formal charge, preliminary hearing, indictment, information, or arraignment. *Id*. at 398.

We reject defendant's reliance on *Brewer* and *Massiah* for the proposition that he was entitled to counsel during the video call with FM in light of *Texas v Cobb*, 532 US 162; 121 S Ct 1335; 149 L Ed 2d 321 (2001). The defendant in that case was indicted for burglary and obtained an attorney to represent him for that charge. *Id*. at 165. The police questioned the defendant about people who had disappeared from the burgled home, and the defendant confessed to murdering them during the burglary. *Id*. at 165-166. The defendant argued that "his right to counsel had attached when" an attorney was appointed for the burglary case and that the police "were therefore required to secure [the attorney's] permission before proceeding with the interrogation" about the missing people. *Id*. at 166. A lower court agreed with this argument, concluding that the murders were factually intertwined with the burglary. *Id*. at 167. The Supreme Court disagreed, ruling that the Sixth Amendment right to counsel is " 'offense specific.' " *Id*. at 165.

It is not in dispute that defendant was in jail and represented by an attorney when the October 24, 2016 call with FM occurred. At that time, he had representation for purposes of a *prior stalking charge*. The warrant for solicitation to murder is dated November 10, 2016, and the bindover occurred on December 13, 2016. The warrant for the current stalking charge—i.e., the charge at issue at trial and at issue in this appeal—is dated October 26, 2016, and the bindover occurred on December 14, 2016. Even if the prior stalking offense had a "relationship" with the instant offenses, under the rule of *Cobb*, no Sixth Amendment violation occurred during the call with FM because the right to counsel is offense-specific, and at the time of the video call, adversarial proceedings had not commenced in the current cases.

Defendant contends that his statements to Allen and Close were obtained in violation of his Sixth Amendment right to counsel because they were essentially acting as agents of the police. But this is simply not accurate. There was no evidence that the police directed Allen or Close to obtain information. Instead, the two witnesses obtained the information and chose to share it with the police. Defendant cites *State v Marshall*, 882 NW2d 68 (Iowa, 2016),[13] in support of his argument, but in that case the court agreed that the government is not prohibited from using evidence it obtains through luck or happenstance, see *id*. at 83, which is essentially what occurred here. There is no evidence of a "proffer agreement or any kind of meaningful relationship between" Allen and the police or between Close and the police in connection with defendant's cases. *Id*. at 101.[14]

---

[13] Out-of-state caselaw is not binding, but may be persuasive. *People v Spaulding*, 332 Mich App 638, 648 n 2; 957 NW2d 843 (2020).

[14] Because defendant's Sixth Amendment arguments were without merit, counsel's failure to raise them below did not, contrary to defendant's assertion, fall below an objective standard of reasonableness. *Ackley*, 497 Mich at 389.

## VIII.  EXTRANEOUS INFLUENCE ON JURY

In the midst of trial, a juror expressed bias toward defendant's ethnic origin.  The court stated that it would dismiss the juror, as an alternate, before the start of deliberations, and it did so.  Defendant contends that the trial court should have held a hearing to determine whether the juror improperly influenced other jurors who actually deliberated.  We disagree.

Issues pertaining to the trial court's decision to remove a juror are reviewed for an abuse of discretion.  See *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011).

Because the juror in question was struck, defendant's argument, at its essence, is that the remaining jurors were likely subjected to an improper extraneous influence—i.e., subjected to the biased juror's improper mindset.  "A jury verdict may be challenged on the basis of juror misconduct . . . when the verdict is influenced by matters unrelated to the trial proceedings." *People v Fletcher*, 260 Mich App 531, 540-541; 679 NW2d 127 (2004).  Bias arising from defendant's ethnicity is certainly not a proper matter for the trial and is thus "unrelated to the trial proceedings."  To establish error requiring reversal on the basis of an extraneous influence on the jury, a defendant bears the burden of showing that the jury was exposed to an extraneous influence and that this influence created a substantial and real possibility of affecting the verdict. *Id*. at 540.

Defendant, however, failed to show that the jury was exposed to an extraneous influence.  While one juror expressed bias, there is nothing in the record to show that he communicated this bias to any other juror.  The court specifically addressed the concern about possible communication among jurors by stating that the jurors were not allowed to discuss the case among themselves until deliberations started.  And indeed, the jurors were given this preliminary instruction.  Jurors are presumed to follow their instructions. *Unger*, 278 Mich App at 235.  An appellant has the burden of providing this Court with a record to verify the factual basis of an argument upon which reversal is allegedly warranted. *People v Everett*, 318 Mich App 511, 523; 899 NW2d 94 (2017).  Defendant has not done so and merely speculates that some sort of error occurred that might have come out during further questioning of the biased juror.

In support of his appellate argument, defendant relies on *People v Jackson*, 292 Mich App 583, 593; 808 NW2d 541 (2011).  In *Jackson*, the trial court questioned an "overwhelmed" juror, who was dismissed, about what she might have said to other jurors, and it found that she had said nothing of import to them.  While the trial court, like in *Jackson*, *could* have questioned the biased juror in the present case, it elected to forgo such questioning and rely on the jurors' instruction that they were not to discuss the case until deliberations started.  This was not an unreasonable approach, and defendant has not shown that the deliberating jurors were exposed to an extraneous influence. *Fletcher*, 260 Mich App at 540.  Defendant contends that he is unable to show such an exposure *because* the trial court did not hold a hearing, but (1) the trial court did not abuse its discretion by handling the matter in the way it did and (2) defendant did not move for a new trial and attempt to impeach the jury verdict with additional evidence of actual juror misconduct.  See, e.g., *id*. at 538-540 (stating that impeachment of a verdict, such as by way of juror affidavits, can be appropriate due to improper influences unrelated to the trial proceedings).  Defendant, on the basis of the existing record, has set forth no ground for reversal.

## IX. BINDOVER

Defendant contends that the district court erred by binding over defendant on three counts of solicitation to murder, instead of merely two. He argues that while the evidence arguably supported a bindover in relation to the alleged solicitation of Close and Allen, the count relating to the solicitation of FM was duplicative of the count relating to Close because FM was simply posing as a hitman mentioned by Close. He also contends that FM was the one who engaged defendant as opposed to defendant engaging FM. We disagree.

As an initial matter, defendant's argument is focused on the bindover. He does not make the separate argument that the evidence at trial was insufficient to support a finding of guilt in connection with the solicitation of both Close and FM. In *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010), this Court stated that "the presentation of sufficient evidence to convict at trial renders any erroneous bindover decision harmless." Given defendant's failure to make a sufficiency challenge on appeal, this claim of error does not entitle defendant to appellate relief. *Id*. See also *People v Wilson*, 469 Mich 1018; 677 NW2d 29 (2004) ("If a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover.").

## X. *MIRANDA* VIOLATION

Defendant contends that when FM conducted the video call with defendant at the Ingham County Jail, this amounted to a police interrogation while defendant was in custody. He argues that because he was not informed of his rights under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), any statements he made to FM or to any state officials thereafter should have been suppressed. We disagree.

In *Howes v Fields*, 565 US 499, 511; 132 S Ct 1181; 182 L Ed 2d 17 (2012), the United States Supreme Court indicated that the fact of incarceration alone "is not enough to create a custodial situation" such that *Miranda* warnings must be given. "[S]ervice of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id*. at 512. The pertinent custody question is whether a prisoner is detained and interrogated *within the context of his current environment*—i.e., subject to restrictions or police coercions not inherent in life in the general jail population. See, e.g., *id*. at 514. Defendant freely participated in the video call with FM, did not even know that FM was a police officer, and was free to end the call at any time and go back to his regular day-to-day life in the jail. See, e.g., *id*., at 515-517. He was not in custody for purposes of *Miranda* and his appellate argument is without merit.

## XI. OV 6 AND JURY INSTRUCTIONS

Defendant contends that it was improper to score 50 points for Offense Variable (OV) 6 of the sentencing guidelines. We disagree.

OV 6 deals with the "offender's intent to kill or injure another individual[.]" MCL 777.36. MCL 777.36(1)(a) provides for a score of 50 points if

> [t]he offender had premeditated intent to kill or the killing was committed while committing or attempting to commit arson, criminal sexual conduct in the first or

third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping or the killing was the murder of a peace officer or a corrections officer[.]

A score of 25 points is appropriate if "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result[.]" MCL 777.36(1)(b). Ten points are to be assessed if "[t]he offender had intent to injure or the killing was committed in an extreme emotional state caused by an adequate provocation and before a reasonable amount of time elapsed for the offender to calm or there was gross negligence amounting to an unreasonable disregard for life[.]" MCL 777.36(1)(c). Zero points are appropriate if "[t]he offender had no intent to kill or injure[.]" MCL 777.36(1)(d). MCL 777.36(2)(a) states, "The sentencing judge shall score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury."

Defendant seemingly submits that MCL 777.36(1)(b), (c), and (d)—not just MCL 777.36(1)(a)—must be available to use in a solicitation-to-murder case. And he contends that a score of 25, 10, or zero points under these other subparagraphs might have been appropriate in the present case because there was evidence that defendant had abandoned the idea of killing EM and evidence that defendant had been in emotional turmoil for some time around the time of the alleged solicitations to murder. Defendant argues that because MCL 777.36(2)(a) mandates that the variable be scored in accordance with the jury verdict, it was imperative that the jurors be allowed to consider lesser charges, so that the sentencing court could consider lesser offenses while scoring OV 6. Defendant alternatively argues that the 50-point score for OV 6 should be removed.

Firstly, MCL 777.22(1) states that OV 6 is to be scored for "solicitation to commit a homicide[.]" The trial court properly assessed 50 points for this variable in light of the jury's verdict. See *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), superseded in part by statute as stated in *People v Rodriguez*, 327 Mich App 573, 579 n 3; 935 NW2d 51 (2019) (discussing the standard of review for the scoring of OVs).[15] Indeed, the jury found defendant guilty of three counts of solicitation to commit murder and therefore implicitly found that defendant purposefully and repeatedly—in connection with three different would-be accomplices—sought the murder of EM. The jurors, to reach their verdict, would necessarily have concluded that defendant had a premeditated intent to kill. Defendant's argument that the score for OV 6 should have been zero is without merit.

In addition, defendant has established no plain error[16] in connection with the fact that OV 6 allows for different scoring options but that only one of the options—i.e., the 50-point option— will generally be available in a solicitation-to-murder case. Defendant points to no authority indicating that all scoring options for an OV must be theoretically available for every crime to which the OV applies and as such has demonstrated no clear or obvious error concerning the fact

---

[15] Defendant did challenge the scoring of OV 6 below.

[16] Defendant's jury-instruction argument is not preserved.

-19-

that no instructions on lesser offenses were provided. It is certainly not "clear or obvious," see *Carines*, 460 Mich at 763, that the OVs should dictate whether a jury should be instructed on particular crimes. No error requiring reversal is apparent.

## XII. OV 4 AND OV 10[17]

Defendant contends that the scores for OVs 4 and 10 were not supported by admissions from him or by the jury verdict; he argues that this amounted to a constitutional error and that, therefore, a remand is necessary to determine if the trial court would have imposed a materially different sentence absent the error. He also contends that OVs 4 and 10 were improperly scored based on the record evidence. We disagree. These issues are not preserved and are subject to review under the plain-error doctrine. *People v Kimble*, 470 Mich 305, 310-312; 684 NW2d 669 (2004); *Carines*, 460 Mich at 763-764.

First, with regard to his constitutional argument, defendant was sentenced well after the issuance of *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015). Thus, the argument that the OV score must be in accordance with the jury verdict or in accordance with admissions by defendant is outdated. In *Lockridge*, our Supreme Court remedied any constitutional violation connected with judge-found facts by making the guidelines advisory only. *Id*. at 365. There is no indication that the trial court, when sentencing defendant in 2018, did not follow the mandate of the 2015 *Lockridge* decision.

OV 4 deals with "psychological injury to victim[.]" See MCL 777.34.[18] Defendant received 10 points for OV 4. Ten points are appropriate if "[s]erious psychological injury requiring professional treatment occurred to a victim[.]" MCL 777.34(1)(a). MCL 777.34(2) states, "Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." A statement from EM was presented at sentencing. She stated that the impact of the case on her had been "too traumatic and tremendous to even put into words." She reported she was "treated for anxiety and depression currently," and knew she needed counseling to help her begin the process of rebuilding her life as well as getting past her constant fearful state. She mentioned the stalking and the solicitation to murder and stated that she had "been violated in so many ways, that I don't know it's possible to ever trust again." Defendant's actions were an escalating series of events during which he persisted in contacting EM, despite PPOs, and eventually, and repeatedly, solicited her

---

[17] Defendant was granted permission to file a pro se supplemental brief following the remand for the *Ginther* hearing. *People v Uraz*, unpublished order of the Court of Appeals, entered November 17, 2022 (Docket Nos. 343695; 343696). But defendant's brief exceeded the scope of the issue addressed on remand in the circuit court, the issue of ineffective assistance of counsel. See *People v Jones*, 394 Mich 434, 435-436; 231 NW2d 649 (1975). For the first time on appeal, defendant raised challenges to the scoring of OVs 9 and 13. These issues are not properly before us. In any event, defendant's arguments do not entitle him to appellate relief.

[18] MCL 777.34 was amended by 2018 PA 652, effective March 28, 2019. The amendment does not affect the language at issue here.

murder. The record is adequate to support a 10-point score for OV 4 in both the stalking and the solicitation cases.

Defendant received 15 points for OV 10, addressing exploitation of a vulnerable victim. MCL 777.40(1)(a) provides for a score of 15 points for OV 10 if "[p]redatory conduct was involved[.]"[19] "Predatory conduct" is defined as "preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a). In *People v Cannon*, 481 Mich 152, 162; 749 NW2d 257 (2008), the Court set forth the following framework for determining whether 15 points should be assessed for OV 10:

> (1) Did the offender engage in conduct before the commission of the offense?

> (2) Was this conduct directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation?

> (3) Was victimization the offender's primary purpose for engaging in the preoffense conduct?

The Supreme Court has identified "stalking" as being predatory in nature. *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011).

Defendant engaged in other stalking activities before the stalking offense at issue in this case. Victimization was defendant's primary purpose for engaging in the prior stalking activities. In addition, during these prior stalking activities, EM had a readily apparent susceptibility to injury—at least to psychological injury—because of the prior romantic relationship between her and defendant and because of *even earlier* stalking activities. The assessment of 15 points for OV 10 in the stalking case was not plainly erroneous.

With regard to the solicitation case, defendant contends that the 15-point score was inappropriate because he "was incarcerated in the Ingham [C]ounty [J]ail at the time of the alleged solicitation, and he was neither lying in wait nor physically stalking the complain[]ant at that time." But looking again to the framework set forth in *Cannon*, 481 Mich at 162, defendant engaged in stalking conduct before the solicitation to kill EM. EM was susceptible to injury due to the fear instilled by the even earlier stalking.[20] And defendant's motivation for engaging in the pre-solicitation stalking was victimization. No plain error is apparent with regard to the scoring of OV 10 for the solicitation case.

---

[19] MCL 777.40 also was amended by 2018 PA 652, effective March 28, 2019. The amendment does not affect the language at issue here.

[20] It is likely that the continuation of the various stalking activities made EM's suffering and fear, when she finally learned that defendant was intending to have her killed, even greater than it would have been in the absence of these preoffense activities.

## XIII. RESTITUTION, FEES, FINES, AND COSTS

Defendant contends that the court improperly ordered $2,273 in restitution for damage to EM's vehicle; he contends that this amount pertained to uncharged conduct and speculative actions and that he should not have been ordered to pay it. He further argues that because the lower court cases were consolidated into one proceeding, the imposed costs, fines, attorney fees, and crime victim's fees should have been one single assessment. Finally, he contends that there should have been no charge for DNA testing because this fee was paid in an earlier case. We grant relief in part.

Defendant's arguments are not preserved and thus we review them under the plain-error doctrine of *Carines*, 460 Mich at 763-764.

It appears that a plain error did occur with regard to restitution and that it affected the outcome of defendant's sentencing conditions. See *People v McKinley*, 496 Mich 410, 420; 852 NW2d 770 (2014) ("Conduct for which a defendant is *not* criminally charged and convicted is necessarily *not* part of a course of conduct that gives rise to the conviction."). The car damage occurred *before* acts comprising the current stalking charges. Yet, as noted in *Carines*, 460 Mich at 763-764, even when an outcome-determinative plain error occurs, an appellate court has discretion regarding whether to reverse, and reversal

> is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [Citation, quotation marks, and brackets omitted.]

Defendant's guilt or innocence is not at issue in terms of ordering restitution, so the question is whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. We conclude that it did not. First, defendant's stalking actions and solicitation to murder were all part of one broader scheme to harass and harm EM. In addition, the prosecutor stated at sentencing that the $2,273 restitution amount had been "communicated" to defense counsel and "[t]here is not an objection." Defense counsel made no response to this comment by the prosecutor. While counsel's silence may not have amounted to an outright waiver of the current restitution issue, it provides strong support for imposing the order of restitution. Further, defendant stated at sentencing that at a certain point in the past he had indeed wanted to "somehow compensate [EM] for her losses." Under the circumstances of the present case, we decline to reverse the order of restitution.[21]

Defendant contends that he should not have been assessed court costs and fees for each lower court file. The trial court imposed, for LC No. 16-001065-FC, a crime victim's fee of $130,

---

[21] Defendant makes no argument that the $2,273 was inaccurate in terms of capturing the damage to EM's vehicle. He *does* argue on appeal that it was not proven that he was the person who inflicted the damage. This, however, was a reasonable inference from the evidence and defendant's admission to Close that defendant had damaged EM's car.

state costs of $204, attorney fees of $600, a fine of $100, court costs of $700, and a DNA assessment fee of $60. For LC No. 16-001064-FH, the trial court imposed a crime victim's fee of $130, state costs of $68, attorney fees of $600, a fine of $100, court costs of $700, and a DNA assessment fee of $60.[22] The state minimum costs were mandatory for defendant's four felonies. See MCL 769.1k(1)(a) and MCL 769.1j(1)(a). As for the crime victim's fees, MCL 780.905(2) states that a court "shall order a defendant to pay only 1 [crime victim's fee] . . . per criminal case." Defendant has not met his burden of showing a clear or obvious error with respect to the imposition of two such fees because there were two criminal cases initiated by two separate informations, even if they were resolved in one trial. It is true that in *People v Earl*, 495 Mich 33, 41; 845 NW2d 721 (2014), the Court noted that the fee does not depend on the number of *charges*, but here there were two *cases*—one consisting of one charge and one consisting of three charges.

As for attorney fees and court costs, defendant has not established any clear or obvious error with regard to the bare assertion that they were improperly imposed for each criminal case because each case involved some separate attorney work and some separate court expenditures and work.[23] And indeed, defendant provides no authority in support of his argument that two separate but jointly tried cases cannot support the imposition of separate costs and attorney fees. *Bowling*, 299 Mich App at 559-560.[24]

MCL 769.5 states as follows with regard to criminal fines:

(1) If a statute provides that an offense is punishable by imprisonment and a fine, the court may impose imprisonment without the fine or the fine without imprisonment.

(2) If a statute provides that an offense is punishable by fine or imprisonment, the court may impose both the fine and imprisonment in its discretion.

MCL 750.411i(3) provides that aggravated stalking is punishable by imprisonment or a fine; accordingly, the imposition of a $100 fine was permissible for the stalking case. MCL 750.157b, however, provides that solicitation to murder is punishable by imprisonment and does not mention this it is punishable by a fine. Therefore, a clear or obvious error occurred that affected the fairness of judicial proceedings because a fine was imposed in the solicitation case—without authorization by the very penal statute in question. See *People v Johnson*, 315 Mich 163, 198-199; 889 NW2d 513 (2016).

---

[22] Restitution was ordered only once.

[23] For example, in *People v Cameron*, 319 Mich App 215, 231; 900 NW2d 658 (2017), the Court noted that court costs are concerned with "the . . . cost of a criminal case." Again, there were two cases at issue here.

[24] In addition, defendant does not in any way elaborate upon his brief statement about a defendant's ability to pay.

Finally, in light of MCL 28.176(3), the prior taking of a DNA sample exempts defendant from having to pay for an additional assessment. In light of this provision, it is clear or obvious that defendant was improperly assessed two $60 DNA fees in violation of clear statutory language, and, therefore, we vacate one of the fees. *Carines*, 460 Mich at 763. Defendant contends that he should be required to pay *nothing* as a DNA fee for the instant cases because he already paid a DNA fee in a *prior* case. Although he attempts to prove this prior payment by way of an attachment to his appellate brief, and an appellant may not expand the record on appeal. *Nix*, 301 Mich App at 203.

We affirm defendant's convictions and sentences in both appeals. We vacate the $100 fine and the $60 DNA fee in Docket No. 343696, but affirm the remainder of the ordered restitution, fees, costs, and fines in both appeals.

/s/ Thomas C. Cameron
/s/ Douglas B. Shapiro
/s/ Anica Letica